UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JANN ORTMAN,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ANDREW SAUL, Commissioner of the<br>Social Security Administration,<br><br>                    Defendant. | 4:19-CV-04049-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Jann Ortman, seeks judicial review of the Commissioner's final

decision denying her application for social security disability benefits under

Title II of the Social Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  Ms. Ortman filed her application solely for Title II, or SSD/DIB benefits.  AR162-68.  Her coverage status for SSD/DIB benefits expires on December 31, 2020.  AR12; 169.  In other words, in order to be entitled to Title II benefits, Ms. Ortman must prove disability on or before that date.

Ms. Ortman has filed a complaint and has requested the court to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.    Statement of the Case

This action arises from plaintiff Jann Ortman's ("Ms. Ortman") application for Social Security Disability Income benefits ("SSDI") filed on June 27, 2016, alleging disability since May 15, 2015, due to multiple sclerosis ("MS"), herniated cervical disc, lost concentration, fatigue, brain fog, headaches, leg tremors, jumpy restless legs, muscle aches and pains, anxiety, panic attacks, over active bladder and fibromyalgia. AR162, 213, 235-36, 242, 274.

Ms. Ortman's claim was denied initially and upon reconsideration. AR124, 130. Ms. Ortman then requested an administrative hearing. AR140.

Ms. Ortman's administrative law judge hearing was held on May 7, 2018, by Richard Hlaudy ("ALJ"). AR57. Ms. Ortman was represented by an attorney

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket 9). The court has made only minor grammatical and stylistic changes. Citations to the appeal record will be cited by "AR" followed by the page or pages.

other than her current counsel at the hearing, and an unfavorable decision was issued on August 9, 2018.  AR9, 55.

At Step One of the evaluation, the ALJ found that Ms. Ortman was insured for benefits through December 31, 2020, and that she had not engaged in substantial gainful activity ("SGA") since May 15, 2015, the alleged onset of disability date.  AR14.

At Step Two, the ALJ found that Ms. Ortman had severe impairments of MS, cervical degenerative disc disease, and fibromyalgia; finding that each of those medically determinable impairments significantly limited Ms. Ortman's ability to perform basic work activities.  AR14.

At Step Three, the ALJ found that Ms. Ortman did not have an impairment that met or medically equaled one of the listed impairments in 20 C.F.R. 404, Subpart P, App 1 (hereinafter referred to as the "Listings").  AR14. The ALJ noted that there is no "direct listing" pertaining to some of Ms. Ortman's impairments, including fibromyalgia.  AR15.  The ALJ found that the "evidence does not establish the medical signs, symptoms, laboratory findings, or degree of functional limitation required to meet or equal the criteria of any listed impairment. . . ."  AR15.

The ALJ determined that Ms. Ortman had the residual functional capacity ("RFC") to perform:

> less than a full range of light work as defined in 20 CFR 404.1567(b).  The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently.  She can stand and walk 6 hours in an 8-hour workday and can sit 6 hours in an 8-hour workday.  She can occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds.  She can frequently

3

balance and occasionally stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to extreme cold, extreme heat, extreme vibration, and workplace hazards. The claimant is incapable of sitting or standing for more than an hour and she must alternate between sitting and standing every hour.

AR15.

The ALJ's subjective symptom finding was that Ms. Ortman's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of the symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR16.

The ALJ considered the opinions of the State agency medical consultants, who opined that Ms. Ortman could perform medium work, and gave them little weight; rejecting their assessments because the record did reflect that Ms. Ortman became fatigued with over-exertion, which is more consistent with a RFC to perform work at a light exertional level. AR19.

The ALJ considered and gave partial weight to the opinions of treating physician Christopher Boschee, D.O., who the ALJ indicated had opined that Ms. Ortman could occasionally lift 20 pounds and frequently lift less than 10 pounds; only stand/walk or sit less than 2 hours in an 8-hour work day; sit less than 2 hours in an 8-hour workday; frequently climb ramps; never climb stairs; rarely balance, stoop, kneel and crouch; frequently reach/handle; occasionally finger/feel; avoid exposure to extreme cold, heat and hazards; and avoid concentrated/moderate exposure to wetness and humidity. AR19. The

ALJ stated the lifting limitations were "similar" to the RFC he had determined, but the sitting and standing limitations were "inconsistent with general normal physical exams of the claimant and her admitted levels of daily living activities." AR19. The ALJ also noted that Dr. Boschee stated in September, 2016, that Ms. Ortman was disabled due to her multiple sclerosis and resultant weakness and fatigue. AR19.

The ALJ stated, in summary, the RFC he determined was supported by the medical treatment records that reflected Ms. Ortman's "multiple sclerosis was stable with medication and resulted in 'minimal functional deficits.' It is further supported by minimal findings from mental status and physical exams of the claimant, which observed her memory, concentration and judgment remained normal and that she retained full strength, sensation, balance, range of motion, and a normal gait" and some support from her activities of daily living (ADLs) such as no difficulty with personal care and her ability to cook, clean and do housework. AR19-20.

Based on the RFC determined by the ALJ, the ALJ found Ms. Ortman was capable of performing her past relevant work as a teacher's aide and a cashier, and denied her claim. AR20.

Ms. Ortman timely requested review by the Appeals Council, and the Appeals Council denied Ms. Ortman's request for review, making the ALJ's decision the final decision of the Commissioner. AR1-4, 161.

**B.** **Plaintiff's Age, Education and Work Experience**

Ms. Ortman was born in August of 1962, and she completed the 12th grade in 1980.  AR162, 214.

The ALJ found that Mr. Ortman had past relevant work as a teacher's aide, Dictionary of Occupation Titles (DOT) #249.367-074, and as a cashier, DOT #211.462-010.  AR20, 89-92.

**C.** **Relevant Medical Evidence (chronological sequence)**

Ms. Ortman was seen at the Neurology Clinic on April 10, 2015, to follow-up on her relapsing MS.  AR346.  She had been experiencing right leg pain below the knee that began about 5 days previously.  AR346.  About 8 years earlier she had weakness in the left foot for three days.  AR346. Ms. Ortman had been taking the prescribed medication Rebif for the previous 11 years for treatment of MS.  AR346.  Areen Said, M.D., observed that Ms. Ortman's history of MS had been clinically stable.  AR346.  Dr. Said documented normal clinical examination findings for Ms. Ortman except for discomfort on palpation of the medial aspect of her right leg just below the knee.  AR346.  Dr. Said recommended a magnetic resonance imaging (MRI) of Ms. Ortman's brain and c-spine and an ultrasound of her left lower extremity. AR347.

Ms. Ortman was seen for chiropractic treatment for her right leg pain on April 11, 2015.  She described the pain as acute aching, dull and tingling discomfort radiating into her upper and lower leg to her right foot and located in the lumbosacral joint.  AR300.  She was unable to sit and work because that

activity caused upper and lower leg pain and numbness when attempted for more than five minutes.  AR302.

Ms. Ortman was seen at the Neurology Clinic on May 28, 2015, to follow-up on her relapsing MS.  AR335.  MRIs revealed multiple high signal abnormalities in the periventricular and deep white matter in her brain consistent with demyelinating disease consistent with MS.  AR335, 338. Ms. Ortman also had high signal abnormality at C2-C3 and mild to moderate disk bulge at C6-C7.  AR335, 339.  Dr. Said noted that Ms. Ortman was overall doing well and was having no symptoms that day.  AR335.  Dr. Said also documented normal clinical examination findings.  AR336.  Dr. Said's assessment was relapsing remitting MS stable on Rebif[3].  AR336.

Ms. Ortman was seen for chiropractic treatment for her chest and mid-thoracic spine on July 27, 2015.  AR307.  Ms. Ortman stated that she did not have any problems completing ADLs.  AR307.

Ms. Ortman was seen for chiropractic treatment for continued tightness in her mid back on October 1, 2015.  AR309.

Ms. Ortman was seen for chiropractic treatment for continued tightness in her mid-back on February 9, 2016.  AR311.

---

[3] Rebif (interferon beta-1a) Injection is made from human proteins and is used to treat relapsing MS.  Rebif will not cure MS; it will only decrease the frequency of relapse symptoms.  Common side effects of Rebif include pain, swelling, or redness at the injection site.  Flu-like symptoms such as headache, dizziness, fatigue, fever, chills, stomach pain, runny or stuffy nose, and muscle aches may occur when you first start Rebif.  See https: www.rxlist.com/rebif-side-effects-drug-center.htm.  All internet citations last checked December 13, 2019.

Ms. Ortman saw Dr. Boschee on May 25, 2016, reporting chest congestion, lethargy, abdominal cramping, back pain, urinary frequency, and being unable to get motivated and stay focused. AR394. She was starting to feel better so no further workup or treatment was taken. AR395. Ms. Ortman was seen for chiropractic treatment for her back on May 27, 2016. AR366.

Ms. Ortman saw Krista M. Hoyme, D.O., on June 10, 2016, for low-back pain and vaginal burning, which started weeks ago but had gotten worse, and she had just completed a 5-day dose of steroids. AR392. Dr. Hoyme documented normal clinical examination findings except for significant atrophic findings in the vaginal vault. AR393. Dr. Hoyme prescribed medication for treatment. AR392.

Ms. Ortman saw neurologist Elizabeth Kruse, M.D., at Neurology Associates on June 1, 2016, to follow-up on her MS. AR372. She had been off work since September but recently returned to work due to financial pressure. AR372. Ms. Ortman reported aching and "humming" in her arms by the fifth day of work, being exhausted, having bilateral tingling in her feet, increased urinary urgency, and feeling pressure in her chest. AR372. She reported feeling "lifeless." AR372. Dr. Kruse documented normal neurological examination findings. AR373. Additional imaging was discussed but Ms. Ortman was hesitant to due the cost. AR374. Dr. Kruse prescribed prednisone. AR374.

Ms. Ortman saw Dr. Boschee on September 1, 2016, to follow up on her MS and discuss disability. AR387. Dr. Boschee had previously recommended to Ms. Ortman that she should be evaluated for disability. AR387. Dr. Boschee stated that he felt Ms. Ortman should appeal her disability denial because he felt she was disabled due to the weakness and fatigue caused by the MS. AR387. Dr. Boschee explained that Ms. Ortman had MS that caused weakness in her right leg and right arm; periodic weakness throughout her body; had difficulty getting words and thought processes in order; and was recently having urinary problems. AR387. These conditions have progressed to where performing a full-time job would be very difficult. AR387.

Dr. Boschee noted that Ms. Ortman really wanted to work and to be productive, but she gets very fatigued when she tries. AR387. She reported that when she works a few days she becomes very fatigued for the next couple of days requiring her to call in sick "quite a bit." AR387. Examination revealed weakness to her right leg and right arm and bilateral hand weakness. AR388. Ms. Ortman reported she gets a "fogginess" when trying to think. AR387. Ms. Ortman had also been to the urologist due to urinary issues and they were believed to be caused by her MS. AR383, 387. Brian Lindaman, M.D., discussed additional medication options with Ms. Ortman. AR383.

Ms. Ortman saw Dr. Boschee on May 25, 2017, for a physical and referral to her neurologist. AR406. Her assessments included MS and chronic pain syndrome for which Cymbalta was prescribed, and Dr. Boschee noted she may have fibromyalgia. AR407.

Ms. Ortman saw neurologist Efrat Feldman, M.D., at Neurology Associates on July 17, 2017, to follow-up on her MS.  AR413.  Ms. Ortman continued on Rebif injections three times per week without side effects and reported no physical flares of the MS, but she reported fatigue, memory and confusion problems.  AR413.  She had received oral steroids the prior week for fatigue, and had been diagnosed with fibromyalgia a month earlier.  AR413.  Dr. Feldman noted a history of a broken neck in 1997.  AR414.  Dr. Feldman documented normal clinical findings.  AR415-16.  Ms. Ortman denied depression  AR413.  Additional imaging was discussed but Ms. Ortman rejected it due to costs.  AR416.  Dr. Feldman encouraged Ms. Ortman to establish a fitness plan including walking, Pilates and yoga.  AR416.  Dr. Feldman also discussed smoking cessation with Ms. Ortman.  AR416.

Ms. Ortman saw neurologist Dr. Feldman on February 26, 2018, to follow up on her MS.  AR418.  She reported poor energy level, chronic numbness in her lower extremities, chronic muscle spasms in her legs, unsteady balance, bladder incontinence, restless legs, and fair mood and cognition.  AR418.  Ms. Ortman described "mind fog," fatigue and decreased motivation.  AR419.  Dr. Feldman documented normal examination findings except for positive Romberg with swing to the right side.  AR421.  Dr. Feldman recommended current imaging but Ms. Ortman explained she could not afford the tests, and continued to decline after Dr. Feldman offered social worker

involvement.  AR422.  Dr. Feldman prescribed Provigil.[4]  AR422.  Dr. Feldman counseled Ms. Ortman on smoking cessation.

On April 29, 2018, Dr. Boschee completed a medical source statement as to Ms. Ortman's limitations if she attempted full-time work.  AR425-27.  Dr. Boschee opined that she would be limited to lifting 20 pounds occasionally and less than 10 pounds frequently; standing and/or walking less than 2 hours per 8-hour workday with normal breaks; and sitting less than 2 hours per 8-hour workday; never climbing ladders and scaffolds; frequently climbing ramps and stairs; limited vision for near acuity, far acuity, depth perception, and accommodation; avoiding all exposure to extreme cold, extreme heat, fumes odors, dusts, gases, and poor ventilation; avoiding moderate exposure to humidity; avoiding concentrated exposure to wetness; and avoiding all exposure to hazards, machinery, and heights.  AR425.  Dr. Boschee also limited her pushing and pulling in the upper and lower extremities, and stated she could only rarely balance, stoop, kneel, and crouch in a work setting.  AR426.  Dr. Boschee also limited Ms. Ortman to frequent reaching and handling, and only occasional fingering and feeling.  AR426.  Dr. Boschee explained that Ms. Ortman's fatigue from her MS would progress over the day and that her fingers tingle and get worse as she tires.  AR426.

---

[4] Provigil (modafinil) is a medication that promotes wakefulness and is thought to work by altering natural chemicals (neurotransmitters) in the brain.  It is used to treat excessive sleepiness caused by sleep apnea, narcolepsy, or shift work sleep disorder.  Provigil may also be used for purposes not listed in the medication guide.  See https://www.drugs.com/provigil.html.

**D.      State Agency Assessment**

State agency physician consultants at the initial level on August 26, 2016, opined that Ms. Ortman had severe MS and a herniated bulged disc in her neck, and that she could perform medium exertion work. AR100-10. The state agency physician consultants at the reconsideration level on January 14, 2017, made similar findings. AR110-23.

**E.      Testimony at ALJ Hearing**

**1.      Ms. Ortman's Testimony**

Ms. Ortman testified that she was right-handed, that she had lost around 25 pounds without trying, and did not eat much. AR62. She had a high school diploma. AR62.

Ms. Ortman testified that she last attempted to work at LifeScape, but lasted 8 days and could not continue working because she became sick and experienced extreme fatigue, brain fog, painful tingly hands and feet, and a very heavy right leg. AR63. She explained that each day became harder and harder, and she had extreme fatigue after the very first day. AR70. Ms. Ortman said she then went to her MS doctor and was treated with 10 days of steroids. AR71. Ms. Ortman stated that the steroids helped her. AR71.

Ms. Ortman testified that in her job as a teacher's aide in North Dakota she was sitting most of the day. AR64, 67. She testified that she was allowed to use all her sick leave plus additional time off because they needed people due to the oil boom. AR69. Ms. Ortman testified that she lost her job when the school's student population significantly decreased the next year. AR70.

Ms. Ortman also stated that her husband lost his job. AR70. She testified that while working as a cashier at Dakota Drug she was provided a stool and could sit or stand at the register. AR65-66. Ms. Ortman worked at Dakota Drug before she worked as a teacher's aide. AR226.

Ms. Ortman testified that her mother takes her to run errands or go out for lunch or a drive, but she limits it to no longer than two hours because her symptoms exacerbate, such as "a weird feeling down my back;" tingly and vibrating arms and legs; shaky, numb and tingling hands; headaches; and brain fog. AR72-73. She said if she over exerted herself, she would lie down for the rest of the day and not do anything the next two or three days afterwards. AR73. Ms. Ortman testified that fluorescent lights bother her, and she wore sunglasses to the hearing to alleviate symptoms. AR74. She has perception issues when in hallways. AR74.

Ms. Ortman testified that she normally sleeps from 8:30 p.m. until about 10:00 a.m., but napped twice for two to three hours per day. AR74-75. She said that both cold and heat bother her a lot. AR75. Between November 1st and February 1st she had only been out of the house eight times. AR75.

Ms. Ortman has a delivery service deliver her groceries. AR76. Ms. Ortman testified that she does not cook any longer, except for putting something in a pan and heating it up. AR76. She said she no longer used knives because her fingertips are tingly, numb and shaky. She said she does clean, but her house is small and she cleans about 15 minutes at a time. AR77. Ms. Ortman testified that she did very light housework that was not too

13

strenuous.  AR84.  Her husband cooks on the weekends, and they eat leftovers during the week.  AR84.  Ms. Ortman watches television.  AR86.  Ms. Ortman stated that she used acetaminophen for headaches and if her headache is really bad, she will lie down.  AR86.

Ms. Ortman testified she was diagnosed with fibromyalgia, which causes pain and stiffness, when she moved to Sioux Falls in 2016.  AR78. Ms. Ortman testified that she has to get up from sitting to move around because "everything aches."  AR79-80.  Ms. Ortman testified that when she is not working, she does better because she can control when she lies down, sits down, stands or sleeps.  AR81.

Ms. Ortman was asked about her ability to think and she testified it felt like her brain has shut off when she is experiencing a flare up, or she is tired, or becoming fatigued.  AR83.  She gave an example of being out with her mother and walking by something and telling her mother they were not going to look at pillows because she needed to leave, and her mom laughed at her because she was looking at purses, rather than pillows.  AR83.  She said she had very low concentration ability.  AR83.

Ms. Ortman was having discomfort in her neck during the hearing, causing her to "shrug" her shoulders with each of her answers.  AR87. When asked if sitting at a desk looking at a computer would affect her, she said it would bother her neck.  AR87.

### 2. Vocational Expert Testimony

The ALJ asked the vocational expert (VE) a hypothetical that incorporated the limitations in the RFC, and the VE testified the individual could perform Ms. Ortman's past work of cashier as she performed it, and the teacher aide job as performed, stating "it looks like it could be done, based on testimony." AR90-91.

The VE testified that an individual could be off task throughout the day up to 10-15 percent of the time in 6 to 10 minute increments each hour, and the VE agreed that if an individual were absent, late, or left early more than three days per month, they would not be able to sustain employment. AR93-94.

### 3. Other Evidence

On August 2, 2016, Ms. Ortman completed a function report as part of her application and stated in response to a question about what she does from the time she wakes until she goes to bed in the space of four lines, as follows: "make breakfast – sit on couch – laundry – dust – make lunch for me – make supper – water flowers – run errands – do stretches – take meds – go to restroom – make bed – take two hour nap – (maybe another 1 hour nap later.)" AR236. Ms. Ortman also stated on the report that she had no problems with personal care. AR236. Ms. Ortman stated that she prepared "complete meals with directions – some frozen foods," and as to changes in her cooking habits, she said she now uses recipe cards, and uses more frozen meals than before. AR237. Ms. Ortman reported that she cleaned, did laundry, vacuumed, and

did paperwork "all combined about 2 hours a day – need to take breaks." AR237.  Ms. Ortman stated that she went outside once or twice a day.  AR238. Ms. Ortman reported that she would travel by walking, driving a car, or riding in a car when going out, and that she could go out alone.  AR237.  Ms. Ortman stated she shopped for clothes, medicine, and groceries once a week for an hour (AR238), but also stated under the question on social activities: "I get lost in restaurants coming from the washroom to the booth + lose my car a lot at stores parking lots."  AR239.

Ms. Ortman indicated that she was able to handle her finances and that she would double and triple check her written checks and counting money. AR238-39.  Ms. Ortman watched television, colored in adult coloring books, read, and attended church.  AR239.  Ms. Ortman also spent time with others by Facebook, phone call, eating out, attending church, and in person visits. AR239.  Ms. Ortman reported in the same report that she had "fatigue – weak – muscle aches – headaches – balance issues – tingling – can't think – no interest in things – brain fog – don't remember things or words overall body gets tired + need a break or nap."  AR240.  Ms. Ortman added in the function report that completing it was overwhelming and it took a friend's help and two days to complete.  AR242.

**F.    Disputed Facts**

The following facts were proposed by the plaintiff and disputed by the defendant because the proposed facts were an absence of fact rather than a fact:

1.     At Step Three the ALJ did not state in the decision which, if any, specific listed impairments he considered in determining whether Ms. Ortman's fibromyalgia was equivalent to a listed impairment. AR14-15.

2.     The ALJ also noted that Dr. Boschee stated in September, 2016, that Ms. Ortman was disabled due to her multiple sclerosis and resultant weakness and fatigue (AR19), but the ALJ did not state what, if any, weight he gave that statement of disability from Dr. Boschee.  AR19.

## DISCUSSION

### A.     Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Biestek v.Berryhill, 587 U.S. ___, 139 S.Ct. 1148, 1154 (2019); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Biestek, 139 S.Ct. at 1154; Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence

supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993); <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. <u>Smith</u>, 982 F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

18

months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment

must be severe, making the claimant unable to do his previous work, or any

other substantial gainful activity which exists in the national economy.  42

U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is

disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB

applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520.  The five steps are as follows:

> **Step One**:  Determine whether the applicant is presently engaged
> in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the
> applicant is engaged in substantial gainful activity, he is not
> disabled and the inquiry ends at this step.

> **Step Two**: Determine whether the applicant has an impairment or
> combination of impairments that are *severe*, i.e. whether any of the
> applicant's impairments or combination of impairments
> significantly limit his physical or mental ability to do basic work
> activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment
> or combination of impairments the applicant is not disabled and
> the inquiry ends at this step. NOTE: the regulations prescribe a
> special procedure for analyzing mental impairments to determine
> whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821
> (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure
> includes completion of a Psychiatric Review Technique Form
> (PRTF).

> **Step Three**: Determine whether any of the severe impairments
> identified in Step Two meets or equals a "Listing" in Appendix 1,
> Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment
> meets or equals a Listing, the applicant will be considered disabled
> without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320
> n.2 (8th Cir. 1985).  This is because the regulations recognize the
> "Listed" impairments are so severe that they prevent a person from
> pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458,
> 460, (1983).  If the applicant's impairment(s) are *severe* but do not
> meet or equal a *Listed impairment* the ALJ must proceed to step
> four.  NOTE: The "special procedure" for mental impairments also

applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).

## C.    **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof

shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857

(8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This

shifting of the burden of proof to the Commissioner is neither statutory nor

regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192

F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long standing judicial

gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir.

1987).  Moreover, "[t]he burden of persuasion to prove disability and to

demonstrate RFC remains on the claimant, even when the burden of

production shifts to the Commissioner at step five." <u>Stormo v. Barnhart</u> 377 F.3d 801, 806 (8th Cir. 2004).

**D.    The Parties' Positions**

Ms. Ortman asserts the Commissioner erred in two ways:  (1) the Commissioner did not properly evaluate whether Ms. Ortman met or equaled a Listing at Step 3 of the analysis; and (2) The Commissioner's formulation of Ms. Ortman's RFC is not supported by substantial evidence.[5]  The Commissioner asserts his decision is supported by substantial evidence in all respects and should be affirmed.

**E.    Analysis**

**1.    Whether the Commissioner Properly Evaluated Whether Ms. Ortman Met or Equaled a Listing at Step 3**

Step 3 of the sequential evaluation requires the ALJ to determine whether any of the claimant's severe impairments, alone or in combination, meets or equals an impairment that is listed at 20 C.F.R. Part 404, Subpart P, App. 1 (a "Listing").  See 20 C.F.R. § 404.1520(d).  If any such impairment or combination of impairments meets or medically equals a Listing, a finding of disability is automatic.  <u>Id.</u>; <u>Shontos v. Barnhart</u>, 328 F.3d 418, 424 (8th Cir. 2003).  If the claimant has an impairment that is not among the Listings, the Commissioner is instructed to compare the claimant's findings to a "closely analogous" listed impairment.  <u>See</u> 20 C.F.R. § 404.1526(b)(2).   The non-listed

---

[5] This assignment of error contains three sub-parts.

impairment is medically equivalent to a listed impairment if it is equal in severity and duration to a listed impairment. 20 C.F.R. § 404.1526(a).

Fibromyalgia is not a Listed impairment. Ms. Ortman asserts, however, that the ALJ should have found her fibromyalgia to be of Listing level. Ms. Ortman asserts the ALJ failed to properly evaluate her fibromyalgia impairment at Step 3 of the analysis because it failed to properly apply Social Security Ruling (SSR) 12-2p. Specifically, Ms. Ortman asserts that under SSR 12-2p, the ALJ was required to evaluate whether her fibromyalgia was medically equivalent to Listing § 14.09D (inflammatory arthritis)—or if not that Listing, whichever other Listing was most analogous. The ALJ's written decision, Ms. Ortman asserts, reveals it did not compare her fibromyalgia to any other specific Listing, which was error.

Social Security Ruling 12-2p instructs the Social Security Administration how to develop evidence in cases where a claimant alleges fibromyalgia as one of their medically determinable impairments. Part of the SSR includes instruction to the SSA on how to evaluate fibromyalgia claims at Step 3 of the 5-step sequential evaluation process (the Listings). The SSR states, in relevant part:

> VI.    How do we consider FM in the sequential evaluation process?
>
> As with any adult claim for disability benefits, we use a 5-step sequential evaluation process to determine whether an adult with an MDI of FM is disabled.
>
> ***
> C.    At Step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the

> Listing of Impairments in appendix 1, subpart P, of 20 CFR part 404 (appendix 1). FM cannot meet a listing in appendix 1 because FM is not a listed impairment. At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.

See SSR 12-2p at Section VI.C.

Because there is no Listing for fibromyalgia, therefore, Ms. Ortman asserts the ALJ should have, but did not, analyze whether her fibromyalgia met or equaled Listing § 14.09D as the basis for an award of disability benefits at Step 3.

Listing § 14.09D requires that Ms. Ortman show (1) inflammatory arthritis as described in listing 14.00D6 and (2) repeated manifestations of inflammatory arthritis, with at least *two* constitutional symptoms (severe fatigue, fever, malaise, or involuntary weight loss), and *one* of the following at the *marked* level: (a) limitation of activities of daily living, (b) limitations in maintaining social functioning, or (c) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. See Listing § 14.09D.

To satisfy the first prong of the test for Listing § 14.09D, Ms. Ortman must satisfy the listing for inflammatory arthritis found at listing 14.00D6. This listing covers a "vast array of disorders that differ in cause, course, and outcome." See Listing § 14.00D6. Subpart 6(e)(ii) of Listing § 14.00D states that listing-level severity is shown in Listing § 14.09D "by inflammatory arthritis that involves various combinations of complications of one or more

major peripheral joints or other joints, such as inflammation or deformity, extra-articular features, repeated manifestations, and constitutional symptoms or signs. Extra-articular impairments may also meet listings in other body systems." Id. In subpart 6(e)(iii), Listing § 14.00D6 goes on to state that "extra-articular" inflammatory arthritis features may involve any body system, including musculoskeletal, ophthalmologic, pulmonary, cardiovascular, renal, hematologic, neurologic, mental, and immune system. Id.

To satisfy the second prong of the test for Listing § 14.09D, four showings must be made: (1) repeated manifestations of inflammatory arthritis as described above, (2) & (3) two of the listed symptoms and (4) one of the listed limitations at the "marked" level. Id. The evaluation of whether Ms. Ortman meets or equals the listing at § 14.09D should be made in the first instance by the ALJ. The ALJ did not consider Listing § 14.09D in its analysis and there are many unanswered questions about the applicability of that Listing to Ms. Ortman's impairments that should be answered first by the ALJ.

Fibromyalgia *was* presented by the record, and the ALJ acknowledged it was a severe impairment. Because it was acknowledged as a severe impairment and did not meet or equal any other Listed impairment, the ALJ should have analyzed it under Listing § 14.09 pursuant to SSR 12-2p.

The Commissioner asserts that because the ALJ evaluated Ms. Ortman's physical impairments under Listings § 1.04 (disorders of the spine) and § 11.09 (multiple sclerosis), its failure to perform the analysis as to fibromyalgia under § 14.09D is harmless. This is so, argues the Commissioner, because the ALJ's

analysis under § 14.09D would have had the same result as it did under the Listings for Ms. Ortman's other two severe physical impairments, because the ALJ made findings sufficient to preclude a § 14.09D Listing based upon its finding that Listings 1.04 and 11.09 were not met.

A careful reading of the ALJ's step three analysis, however, requires the court to reject this argument. The step-three analysis requires the ALJ to determine whether an impairment *or combination of impairments* meets or equals a Listing. As for the ALJ's analysis of whether fibromyalgia met or equaled a Listing, the ALJ stated "the record was reviewed and the evidence does not establish the signs, symptoms, laboratory findings or degree of functional limitation required to meet or equal the criteria of any *listed impairment are* present and no medical acceptable medical source designated to make equivalency findings has concluded that the claimant's medical findings medically equal a listed impairment." As discussed above, fibromyalgia is *not* a Listed impairment. And, the ALJ did not mention or discuss whether it considered fibromyalgia *in combination with* the specifically Listed impairment under consideration when determining whether that Listed impairment met or equaled the Listing requirements.

This leaves the court unable to determine whether it properly considered Ms. Ortman's severe fibromyalgia impairment *at all* at the Step 3 level of the sequential evaluation. The court is therefore likewise unable to discern whether fibromyalgia was among the impairments or "combination of impairments" that was considered *at all* at this Step.

When the court is unable to determine how the ALJ evaluated fibromyalgia at Step 3, the matter must be remanded. The district courts in this district have consistently interpreted SSR 12-2p to require as much. See e.g. Jockish v. Colvin, 2016 WL 1181680 at *7 (D.S.D. Mar. 25, 2016); Sunderman v. Colvin, 2017 WL 473834 at *7 (D.S.D. Feb. 3, 2017); Wheeler v. Berryhill, 2017 WL 4271428 at **3-4 (D.S.D. Sept. 26, 2017).

In each of these cases, the district court remanded for the ALJ's failure to evaluate at Step 3 whether the claimant's fibromyalgia met or equaled a Listing by comparing it to Listing 14.09D—as instructed in SSR 12-2p. Jockish, 2016 WL 1181680 at *7; Sunderman, 2017 WL 473834 at *7; Wheeler 2017 WL 4271428 at **3-4. In Wheeler, the court explained,

> It is clear the Social Security Administration intended an ALJ to evaluate fibromyalgia under Listing 14.09D. "Social Security Regulations . . . 'are binding on all components of the Administration.' " Carter v. Sullivan, 909 F.2d 1201, 1202 (8th Cir. 1990) (citing 20 C.F.R. § 422.408)). The "agency's failure to follow its own binding regulations is a reversible abuse of discretion." Id. The ALJ's finding cannot be sustained because an error of law occurred.

Wheeler, 2017 WL 4271428 at *4. In this case, as in Jockish, Sunderman, and Wheeler, it is impossible for this court to analyze whether the ALJ's reasoning regarding medical equivalence is sound. Wheeler, 2017 WL 4271428 at at *4. For this reason, this case must be remanded for a proper Step 3 analysis pursuant to SSR 12-2p.

## 2. Whether the Commissioner's Formulation of Ms. Ortman's RFC is Supported by Substantial Evidence

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe. Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996). Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[6] Lauer, 245 F.3d at 703 (citations

---

[6] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. See SSR 96-8p.

omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n. 8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that

functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

"[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

While it is true that the ALJ is free to formulate the RFC from all the evidence including the opinion evidence and the medical records, it is also established law that the ALJ may not substitute its own opinions for those of the physician. Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008), nor may the ALJ "play doctor" or rely on its own interpretation of the meaning of the medical records. Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009).

These principles were recently reaffirmed in <u>Combs v. Berryhill</u>, 878 F.3d 642, 647 (8th Cir. 2017). In <u>Combs</u>, the claimant alleged disability as a result of combined impairments of rheumatoid arthritis, osteoarthritis, asthma, and obesity. <u>Id.</u> at 643. The only medical opinions in the file regarding Ms. Combs' RFC were from two state agency physicians who had never treated or examined Ms. Combs. <u>Id.</u> at 644. Those physicians instead based their opinions on their review of Ms. Combs' medical records. They gave differing opinions as to Ms. Combs' RFC (one opined she was capable of light duty work, while the other opined she was capable of only sedentary work). <u>Id.</u> at 645.

In deciding which opinion to credit, the ALJ found Ms. Combs' subjective complaints not entirely credible based upon the ALJ's own review of her medical records and notations therein which indicated she was in "no acute distress" and that she had "normal movement of all extremities." <u>Id.</u> The state agency physicians apparently did not base their opinions on these observations. Ms. Combs asserted the ALJ should have contacted the physicians for clarification of what the notations meant rather than rely upon its own inferences. <u>Id.</u> at 646.

The Eighth Circuit agreed, concluding the ALJ erred by relying on its own inferences as to the relevance of the two phrases "no acute distress" and "normal movement of all extremities" as it was significant to her conditions. <u>Id.</u> at 647. The court found the relevance of these medical terms was not clear in terms of Ms. Combs' ability to function in the workplace, because her medical providers also consistently noted in their treatment records that she was had

rheumatoid arthritis, prescribed medication for severe pain, and noted trigger point and joint pain with range of motion.  Id.  So, by relying on its own interpretation of "no acute distress" and "normal movement of all extremities," in terms of Ms. Combs' RFC, the ALJ failed to fulfill his duty to fully develop the record.  Id.

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations.  That ruling contains requirements for the ALJ's narrative discussion.  One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence as a whole . . ."  Id. at p. 13.  Another is that "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  Id. at p. 14.

The ALJ formulated Mr. Ortman's RFC as follows:

> The claimant has the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b).  The claimant can lift  and carry 20 pounds occasionally and 10 pounds frequently.  She can stand and walk 6 hours in an 8-hour workday and can sit 6 hours in an 8-hour workday.  She can occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds.  She can frequently balance and occasionally stoop, kneel, crouch, and crawl.  She should avoid concentrated exposure to extreme cold, extreme heat, extreme vibration, and workplace hazards.  The claimant is incapable of sitting or standing for more than an hour and she must alternate between sitting and standing every hour.

AR15.  Ms. Ortman asserts the ALJ's formulation of her RFC was not supported by substantial evidence for three reasons, discussed below.

### a. Whether the Commissioner Properly Determined the Limitations from Ms. Ortman's Fibromyalgia

Ms. Ortman asserts the ALJ failed to properly acknowledge the limitations presented by her fibromyalgia, which the ALJ recognized was a severe impairment. The Social Security Administration has published a ruling[7] (SSR 12-2p) regarding how to administer cases in which one of the claimant's medical impairments is fibromyalgia. Although the ALJ acknowledged the existence of SSR 12-2p in its opinion, Ms. Ortman claims the ALJ failed to properly apply it when determining whether fibromyalgia presented limitations which should have been incorporated into her RFC.

Ms. Ortman asserts the ALJ's failure to properly apply SSR 12-2p is made obvious by its focus on "normal" medical examinations and test results, rather than the symptoms that are associated with fibromyalgia, which is contrary to the instruction provided by SSR 12-2p. See e.g. AR 16, 17 (ALJ discusses normal muscle tone, bulk, gait and station); AR 18 (ALJ notes Ms. Ortman has been diagnosed with fibromyalgia, but then notes the objective findings from mental and physical exams remained minimal, and again noted normal findings such as motor strength, tone, coordination and gait).

These repeated references to normal exam results rather than the various symptoms which can be associated with fibromyalgia, asserts Ms. Ortman, indicate the ALJ really did not understand the nature of

---

[7] Social Security rulings do not have the same force and effect as laws or regulations, but they are binding on all components of the SSA and are used to adjudicate Social Security disability cases. See https://www.disability-benefits-help.org/glossary/social-security-rulings

fibromyalgia.  Instead, Ms. Ortman argues, the ALJ should have done what SSR 12-2p mandates, which is to examine the record for "widespread pain and other symptoms *associated* with FM" which may result in exertional and nonexertional limitations.  See SSR 12-2p, Section VI(E)(1) (emphasis added).  These associated symptoms can include widespread pain and chronic fatigue, cognitive memory problems ('fibro fog"), waking un-refreshed, depression, anxiety disorder, irritable bowel syndrome, irritable bladder syndrome, interstitial cystitis, TMJ disorder, reflux disorder, migraines, and restless leg syndrome.  See SSR 12-2p, Section II (B)((2).

The Commissioner responds that the ALJ properly determined the limitations (or lack thereof) presented by Ms. Ortman's fibromyalgia and incorporated them into her RFC.  This is so, the Commissioner argues, because the ALJ considered the longitudinal record, and considered not only the lack of objective medical evidence to support her complaints, but also Ms. Ortman's subjectively reported associated symptoms—including, for example, instances wherein she reported "brain fog" and instances wherein she reported "feeling well" or that she had no fatigue.

The Eighth Circuit has noted that fibromyalgia is a disease which is "chronic, and diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests . . . We have long recognized that fibromyalgia has the potential to be disabling."  Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004) (citations omitted, punctuation altered).

Where the ALJ rejected a claimant's fibromyalgia symptoms and complaints because they were not "substantiated by objective medical testing" the Eighth Circuit reversed and remanded the case because the ALJ "misunderstood fibromyalgia" which likewise adversely affected the ALJ's formulation of the claimant's RFC analysis. Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005).

> Fibromyalgia is defined as a syndrome of chronic pain of musculoskeletal origin but uncertain cause. Stedman's Medical Dictionary, at 671 (27th ed. 2000). Further, "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities." Harrison's Principles of Internal Medicine, at 2056 (16th ed. 2005). The American College of Rheumatology nonetheless has established diagnostic criteria that include "pain on both sides of the body, both above and below the waist, [and] point tenderness in at least 11 of 18 specified sites." Stedman's Medical Dictionary, supra.

Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2010).

In Johnson, as in this case, the treating physician's opinion regarding the claimant's fibromyalgia and its effect on her ability to work was not given controlling or even significant weight. Johnson, 597 F.3d at 412. In Johnson, The ALJ rejected the treating physician's opinion because it relied primarily upon the claimant's subjective complaints and lacked supporting objective medical findings. Id. Because of the unique nature of fibromyalgia, however, the First Circuit criticized the ALJ's reasons for giving little weight to the treating physician's opinion:

> Dr. Ali's "need" to rely on claimant's subjective allegations . . . was not the result of some defect in the scope or nature of his examinations nor was it even a shortcoming. Rather, "a patient's report of complaints, or history, is an essential diagnostic tool" in fibromyalgia cases, and a treating physician's reliance on such

complaints "hardly undermines his opinion as to [the patient's] functional limitations." Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (internal punctuation and citation omitted). Further, since trigger points *are* the only "objective" signs of fibromyalgia, the ALJ "effectively [was] requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines," and this, we think, was error.

Id. at 412 (emphasis in original). The court concluded by finding the RFC formulated by the ALJ was "significantly flawed." Id.

In Rogers v. Commissioner of Soc. Security, 486 F.3d 234, 250 (6th Cir. 2007), the Sixth Circuit likewise reversed and remanded a fibromyalgia case. "[U]nlike medical conditions that can be confirmed by objective medical testing, fibromyalgia patients present no objectively alarming signs. . .[F]ibromyalgia is an elusive and mysterious disease which causes severe musculoskeletal pain . . . [F]ibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion." Id. at 243-44 (citations omitted, punctuation altered). The Rogers court held the ALJ erred by adopting into the RFC opinions of physicians who dismissed the claimant's complaints because they were not substantiated by objective findings. Id. at 244-46. "[I]n light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely on objective evidence are not particularly relevant." Id. at 245.

This court has carefully read the ALJ's evaluation of Ms. Ortman's fibromyalgia symptoms. She was "recently diagnosed" with fibromyalgia in July, 2017, so the ALJ's relevant comments about fibromyalgia are based upon medical records from that date forward. See AR18, 413-18. The ALJ

referenced Dr. Feldman's note dated July 17, 2017, wherein Dr. Feldman stated Ms. Ortman had been diagnosed with fibromyalgia one month ago.  In that doctor's visit, Ms. Ortman reported fatigue that prevented her from working.  AR413  Fatigue is a symptom associated with fibromyalgia according to SSR 12-2p.  But in the next sentence, the ALJ stated, "[h]owever, objective findings from mental and physical exams remained minimal," then the ALJ went on to recite those objective findings.  AR18.

The ALJ next summarized another of Dr. Feldman's treatment notes from 2018.  AR18 (citing AR419-424).  The ALJ noted that though Ms. Ortman reported to her neurologist that she suffered from mind fog, fatigue, and lack of motivation, her physical exam showed "no significant deficits."  AR18. The ALJ then recited the findings from the physical exam, including full strength and normal gait.  Id. (citing AR 421).  These are the only two medical records to which the ALJ cited regarding his analysis of Ms. Ortman's fibromyalgia symptoms and their possible effect upon her RFC.  In both instances, the ALJ cited the fibromyalgia complaints Ms. Ortman voiced to her physician, but then discredited them because her objective examinations were "normal."

As in Garza, Johnson, and Rogers, it appears the ALJ in this case effectively required objective evidence in order to credit her associated symptoms of  fibromyalgia.  As such, the ALJ misunderstood Ms. Ortman's fibromyalgia and as a result, it rejected its associated limitations which may have been necessary in her RFC.  Accordingly, the ALJ's formulation of the RFC was "significantly flawed" and this case should be reversed and remanded

36

for further consideration.  <u>Garza</u>, 397 F.3d at 1089; <u>Johnson</u>, 597 F.3d at 412;

<u>Rogers</u>, 486 F.3d at 243-44.

### b. Whether the Commissioner Properly Determined Ms. Ortman's Mental Limitations

Next, Ms. Ortman asserts the Commissioner failed to properly determine

the mental limitations that should have been included in her RFC.  The ALJ

did not determine Ms. Ortman had any severe mental impairments.  The ALJ

did not determine Ms. Ortman had any non-severe mental impairments.

Nor did Ms. Ortman claim in her disability report (AR213)  or in her hearing

testimony (AR57-94) that she suffered from any mental impairments at all, *per

se*.

Nevertheless, Ms. Ortman asserts the ALJ should have undertaken some

sort of analysis to determine the mental limitations caused by the combination

of the severe physical impairments the ALJ determined that she does have--

multiple sclerosis and fibromyalgia.  This is so, Ms. Ortman argues, because

SSR 96-8p requires that an RFC assessment must include "any related

symptoms" resulting from an individual's medically determinable impairments

or combination of impairments.  Ms. Ortman argues she has mental symptoms

resulting from the combination of her MS and her fibromyalgia, and the ALJ

therefore erred by failing to address--via expert opinion--her ability to sustain

work-related mental tasks/activities in a work setting on a regular and

continuing basis.

Ms. Ortman urges the ALJ overstepped its bounds by "playing doctor" to

determine the mental limitations (or lack thereof) presented by the combination

37

of her MS and fibromyalgia. Mr. Ortman observes the ALJ rejected the opinions of the State agency physicians[8] because the ALJ acknowledged those opinions did not take into consideration that she becomes fatigued with over-exertion. AR19. On the other hand, the ALJ only partially accepted the opinion of Ms. Ortman's treating physician. AR19. The ALJ did not accept Dr. Boschee's opinion that *disabling* extreme weakness and fatigue resulted from Ms. Ortman's MS because, the ALJ explained, such extreme work limitations were inconsistent with Ms. Ortman's "normal" physical exams. AR19.

Ms. Ortman argues the result of the ALJ rejecting all the medical opinions about the effect of her fatigue upon her ability to work is that the ALJ based his RFC formulation upon no *medical* opinion, but upon its own interpretation of the medical records regarding the fatiguing effect that her MS and fibromyalgia have upon her mental capabilities in a work setting.

In his brief, the Commissioner responds that the ALJ committed no error when formulating the RFC as pertains to Ms. Ortman's mental limitations, or lack thereof. Instead, the Commissioner argues, the ALJ "properly considered the evidence regarding [Ms. Ortman's] mental limitations." <u>See</u> Commissioner's brief (Docket No. 17) at p. 15. The Commissioner cites the ALJ's decision wherein the ALJ stated, for example, Ms. Ortman's mental exams were "mostly normal" examinations, that she had "intact memory" and that she was "alert,

---

[8] The State agency physicians opined Ms. Ortman is capable of medium duty work.

38

awake, and able to follow commands," and ""oriented, alert, active, and had normal mood and affect." See Docket No. 17 at p. 15, citing AR16, 17-18, 336, 347.

But Ms. Ortman is correct that the ALJ neither cited or sought an opinion from any of the medical experts as to the significance or meaning of these notations as they pertain to how her severe impairments of MS and fibromyalgia will realistically combine to affect her mental capabilities in the *workplace.* That Ms. Ortman is observed to be "alert" or "able to follow commands" during a 30-minute doctor's appointment may not necessarily translate into the same condition during an 8-hour workday, 5 days per week. "Common sense can mislead; lay intuitions about medical phenomena are often wrong." Myles v. Astrue, 582 F.3d 672, 677 (1st Cir. 2009)(cleaned up). See also, Combs, 878 F.3d at 647 (ALJ erred by relying on its own interpretation of phrases "no acute distress" and "normal movement of all extremities" in the medical records to determine claimant's credibility for purposes of formulating RFC).

This court has already recommended remand for the ALJ to properly reconsider the symptoms associated with Ms. Ortman's fibromyalgia (which include, for example symptoms such as "fibro fog") and the limitations said symptoms will impose upon Ms. Ortman's RFC. In addition to that consideration, the evidence considered on remand should include a direct inquiry to the medical experts about the effect of Ms. Ortman's combined physical impairments upon her mental ability to function in the workplace.

### c. Whether the Commissioner Properly Evaluated the Opinions of the Treating Physician

Ms. Ortman's final assignment of error regarding the RFC formulation is that the ALJ erred by failing to properly evaluate the opinions of her treating physician, Dr. Boschee. Ms. Ortman asserts the ALJ should have assigned greater than "partial" weight to Dr. Boschee's opinions, that the reasons given by the ALJ for failing to do so are not "good" reasons as required by 20 C.F.R. § 404.1527,[9] and that the differences between Dr. Boschee's opinion and the RFC as formulated by the ALJ are not sufficiently explained. The ALJ therefore "played doctor," says Ms. Ortman, which the ALJ is forbidden from doing.

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC. See 20 C.F.R. § 404.1527. All medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in the record;
>
> --whether the opinion is internally consistent;
>
> --whether the person giving the medical opinion examined the claimant;
>
> --whether the person giving the medical opinion treated the claimant;
>
> --the length of the treating relationship;
>
> --the frequency of examinations performed;

---

[9] In her brief, Ms. Ortman cites to 20 C.F.R. § 1520c. That regulation, by its own terms, applies to claims filed after March 27, 2017. Ms. Ortman filed her claim on June 8, 2016. AR12. For purposes of this opinion, therefore, the old regulation (20 C.F.R. § 404.1527) applies.

--whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner,

499 F.3d at 853-854; <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir. 2005)).  "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant."  <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. § 404.1527; <u>Shontos,</u> 328 F.3d at 425; <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict.  <u>Wagner</u>, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion.  <u>Id.</u>; <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing <u>Jenkins v. Apfel</u>, 196 F.3d 922, 925 (8th Cir. 1999)).  However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence.  <u>Harvey</u>, 368 F.3d at 1016.  Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation.  <u>Flynn v. Astrue</u> 513 F.3d 788, 792 (8th Cir. 2008)(citing <u>Casey v. Astrue</u>, 503 F.3d 687, 691-692 (8th Cir. 2007)).  The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small.  <u>Hamilton v. Astrue</u>, 518 F.3d 607, 610 (8th Cir. 2008); 20 C.F.R. § 404.1527(c)(2).

Certain ultimate issues are reserved for the Agency's determination. 20 C.F.R. § 416.927(e). Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination." House, 500 F.3d at 745 (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). See 20 C.F.R. § 416.927(e)(3). The ultimate issues reserved to the Agency are as follows:

1.      whether the claimant is disabled;

2.      whether the claimant is able to be gainfully employed;

3.      whether the claimant meets or exceeds any impairment in the Listing of Impairments (appendix 1 to subpart P of part 404 of 20 C.F.R.);

4.      what the claimant's RFC is; and

5.      what the application of vocational factors should be.

See 20 C.F.R. § 416.927(e)(1) and (2); see also Wagner, 499 F.3d at 849 (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment.") (quoting Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)). The RFC determination is specifically noted to be one of those determinations that is an ultimate issue for the Agency to determine. 20 C.F.R. § 416.927(e)(2); Cox v. Astrue, 495 F.3d 614, 619-620 (8th Cir. 2007).

First, the court notes that this is not an instance in which the court is asked to accept the opinions of the consulting or non-treating, non-examining physician over that of the treating physician. This is because the ALJ gave "little" weight to the opinions of the state agency physicians while it gave

"partial" weight to Dr. Boschee's opinion. In other words, to the extent the ALJ gave Dr. Boschee's opinion any weight at all, it was given more weight than the state agency physician opinions.

In his brief, the Commissioner argues the ALJ properly evaluated Dr. Boschee's opinion. The Commissioner cites three reasons why the ALJ assigned proper weight to Dr. Boschee's opinion: (1) the ALJ properly found that the sitting and standing limitations assigned by Dr. Boschee were inconsistent generally with Ms. Ortman's normal physical examinations in the medical records and with her activities of daily living (ADLs); (2) the Eighth Circuit has stated that a conclusory "checkbox" form like the one completed by Dr. Boschee has little evidentiary value; (3) an opinion that a claimant is disabled or unable to work is an issue that is reserved to the Commissioner, and such opinions are not entitled to controlling or any special significance.

The court will undertake to analyze only the first reason offered by the Commissioner. This is because the other two reasons were not proffered by the ALJ. See AR19. The ALJ discussed Dr. Boschee's opinion in the third full paragraph at AR19. The bulk of that paragraph discusses the substance of Dr. Boschee's opinions, as they are found in AR387 and AR425-27. The entirety of the ALJ's reasoning for assigning only partial weight to Dr. Boschee's opinion is contained in the final sentence of the paragraph in which the ALJ discusses Dr. Boschee's opinion. That sentence states: "The lifting and environmental limitations are similar to the residual functional capacity determination. However, the sitting and standing limitations are

inconsistent with the generally normal physical exams of the claimant and her admitted levels of daily living activities." AR19.

Though the Commissioner has asserted two additional reasons why the ALJ *could or might have* declined to give any greater weight to Dr. Boschee's opinion, this court cannot simply assume on a *post-hoc* basis that those were the reasons why the ALJ gave only partial weight to Ms. Ortman's treating physician's opinion. In <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156 (1962), the Supreme Court addressed this issue. The Court noted the Administrative Procedures Act allows court to determine whether agencies have properly exercised their discretion within the bounds expressed by the legislative delegation of power. <u>Id.</u> at 167-68. In order for courts to make this determination, the agency must "disclose the basis of its order." <u>Id.</u> at 168. "The agency must make findings and support its decision, and those findings must be supported by substantial evidence." <u>Id.</u> Where the agency did not express a particular rationale for its decision, and counsel on appeal supplied a rationale, the Court rejected counsel's *post hoc* rationale because it was never expressed by the agency in its decision. <u>Id.</u> "The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; <u>Chenery</u>[10] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." <u>Id.</u> at 168-69.

The ALJ's assignment of "partial weight" to Dr. Boschee's opinion was supported by only one reason AR19. For the Commissioner to suggest before

---

[10] <u>SEC Comm'n v. Chenery Corp.</u>, 332 U.S. 194 (1947)

this court that, in fact, the ALJ assigned partial weight to Dr. Boschee's opinion because it was a "checkbox" opinion supplied for the first time herein. The ALJ's decision does not reveal any such reasoning for discounting or partial rejection of the opinion of Dr. Boschee. The court rejects this rationale.

The Commissioner is correct in noting Dr. Boschee's statement that Ms. Ortman "has disability due to her multiple sclerosis" is an opinion on the ultimate issue of disability--one of the issues reserved to the Commissioner. See 20 C.F.R. § 416.927(e)(1) and Wagner, 499 F.3d at 849 (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment."). But the ALJ never cited this as a reason for assigning only partial weight to Dr. Boschee's opinion. This court, therefore, will not assume the ALJ rejected Dr. Boschee's opinion on this ground.

The ALJ's stated reason for assigning only partial weight to the physical restrictions imposed by Dr. Boschee (found at AR425-27)—specifically Dr. Boschee's opinion that Ms. Ortman could sit/stand/walk for less than 2 hours each day—was that these opinions were "inconsistent with" Ms. Ortman's "generally normal physical exams." AR19. The ALJ also stated Dr. Boschee's assigned restrictions were inconsistent with Ms. Ortman's "admitted levels of daily living." The task of this court, therefore, is to determine whether these stated reasons are "good" reasons pursuant to 20 C.F.R. § 404.1527(c)(2) to assign only partial weight to Dr. Boschee's opinion.

Ms. Ortman argues, and the court agrees as explained above, that the ALJ's rejection of Dr. Boschee's opinion is flawed because ALJ made its own assumptions about the meaning of the objective findings within her medical records. That Ms. Ortman is observed to be "alert" or "able to follow commands" during a 30-minute doctor's appointment may not necessarily translate into the same condition during an 8-hour workday, 5 days per week. "Common sense can mislead; lay intuitions about medical phenomena are often wrong." Myles, 582 F.3d at 677 (cleaned up). See also, Combs, 878 F.3d at 647 (ALJ erred by relying on its own interpretation of  phrases "no acute distress" and  "normal movement of all extremities" in the medical records to determine claimant's credibility for purposes of formulating RFC).

Similarly, Dr. Boschee indicated not only that Ms. Ortman's fatigue—caused by her MS and fibromyalgia—was disabling (AR387), but also that Ms. Ortman's fatigue worsens as the day progresses, and that her fingers tingle and the more tired she gets, the worse the tingling gets.  AR426.  The ALJ rejected the state agency physician opinions because those opinions failed to take Ms. Ortman's fatigue into consideration. AR19.  But the ALJ also rejected Dr. Boschee's medical opinion as to the effect of Ms. Ortman's fatigue upon her ability to function in the workplace.  So, the only conclusion that can be drawn is that the ALJ made its own assumptions about the interplay between Ms. Ortman's MS, fibromyalgia, her "normal" exam results during doctor visits, and her physical capabilities in the workplace to sit, stand and walk during an 8-hour day.  An ALJ may choose between properly submitted medical opinions,

47

but is not permitted to "set his own expertise against that of a physician who testified before him." <u>Combs</u>, 878 F.3d 647; <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1070 (8th Cir. 2004); <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000); <u>Gober v. Matthews</u>, 574 F.2d 772, 777 (3d Cir. 1978)(the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports."). This court agrees that remand is required in this case for a proper evaluation of the medical opinions.

The ALJ also cited as a reason for rejection of Dr. Boschee's opinion that it was inconsistent with Ms. Ortman's stated ADLs.[11] At the administrative hearing, Ms. Ortman described her ADLs as follows: She does not cook, but if she does, she just pours things in a pan and heats it up. Otherwise her husband cooks. AR76, 84. Her groceries are delivered from Hy-Vee. <u>Id.</u> She avoids the grocery store because the lights bother her. AR85.

She does not use knives because of the tingling and numbness in her hands and fingers. AR76. She does clean the house, but can only do it for about 15 minutes at a time. AR77. She keeps the house at about 73 degrees

---

[11] The ALJ incidentally noted Ms. Ortman's description of her ADLs had been inconsistent. Specifically, the ALJ noted Ms. Ortman's description of ADLs was more restricted in her 2018 hearing testimony (AR57-95) than in the function report which she completed when she filed for benefits two years earlier in 2016 (<u>see</u> AR 235-44). The ALJ did not address, however, whether deterioration of her ability to function should be expected over a two-year period given the combination of Ms. Ortman's admitted severe medical impairments (MS and fibromyalgia). Ms. Ortman was first diagnosed with FM during this two-year interval, in July, 2017. AR413-18.

because cold bothers her.  Id.; AR75.  She does not drive; her mother or husband drive her wherever she needs to go.  AR76.

In her function report, Ms. Ortman described her ADLs as follows:  In response to a question asking what she did from the time she got up till the time she went to bed, she explained she made herself breakfast, then sat on the couch.   She did laundry, then dusted, made herself lunch, made supper, watered the flowers, ran errands, did stretches, took medication, made the bed, took a 2-hour nap and maybe another 1-hour nap later.  AR236.  She could no longer mow the lawn, shovel snow, or do any of the outdoor chores.  Id.  She suffered from jumpy, restless legs, needed more bathroom breaks, and had muscle aches and pains.  Id.  She was able to prepare meals with direction, and made more frozen meals than before.  AR237.  She was able to do housework, but only for 2 hours at a time and needed to take breaks.  Id.  She could do grocery shopping, but only for an hour at a time.  AR238.  Her hobbies were watching TV, going to church, and doing adult coloring books.  AR239.  Her social activities were visiting friends, church and Facebook.  Id.  She did not visit friends as much because she got too tired. AR240.

A claimant need not prove she is bedridden or completely helpless to be found disabled.  Thomas v. Shalala, 876 F.2d 666, 669 (8th Cir. 1989).  To find a claimant has the capacity to perform a certain type of work, she "must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Id.  Substantial gainful activity means working with "reasonable

regularity either in competitive or self-employment." Id.  The courts have repeatedly held that a claimant's ability to engage in basic personal activities such as cooking, cleaning, or simple hobbies does not constitute substantial evidence that she has the functional capacity to engage in substantial gainful activity.  Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000); Eback v. Chater, 94 F.3d 410, 412-413 (8th Cir. 1996).  The substantial evidence as a whole does not support the ALJ's conclusion that Ms. Ortman's ADLs are inconsistent with Dr. Boschee's opinion.  On remand, the ALJ should reconsider this portion of the analysis as well.

**F.     Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Ortman requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

**CONCLUSION**

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Plaintiff's motion to reverse [Docket No. 10] is GRANTED in part as follows:  the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED December 13, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge